## No. 2470.

## JOHN WILLIAMS v. THE STATE.

1. ASSAULT TO MURDER—CHARGE OF THE COURT.—In a trial for assault
with intent to murder, the trial court charged the jury that "an assault
and battery so slight as to show no intention to inflict pain or injury is
not, in law, deemed an adequate cause." *Held* that, although abstractly
correct, the charge, in view of the proof which showed that the injured
party struck the defendant, with a manifest intention to injure him,
before the defendant made the assault, was material error.

2. SAME.—The proof leaving it in doubt whether or not a blow inflicted by
the injured party upon the defendant, causing pain and bloodshed, was
inflicted before the assault by the defendant, the trial court erred in
refusing an instruction to the effect that if the jury should find that the
blow causing the pain and bloodshed was inflicted before the assault, it
would be "adequate cause."

3. SAME—MUTUAL COMBAT.—The trial court charged the jury as follows:
"The law does not permit men to engage in mutual combat, and when
two or more persons engage willingly in mutual combat, each is respon-
sible for the consequences of his own act." *Held* correct in the abstract,
but insufficient to meet the proof in the case, inasmuch as, although
the proof demanded a charge upon mutual combat, the instruction does
not inform the jury of what offense, in any event, the defendant could
be found guilty. See the opinion on the question.

APPEAL from the District Court of Johnson. **Tried below be-**
fore the Hon. J. M. Hall.

The conviction in this case was for assault with intent to mur-
der one William Wells, and the penalty imposed was a term of
two years in the penitentiary.

William Wells was the first witness for the State. He testified
that he lived in Alvarado, Johnson county, Texas. He had
known the defendant since January 1, 1887, on which day he
was cut by the defendant. Witness was the proprietor of a res-
taurant in Alvarado. His restaurant was situated in the rear
of the Poindexter building. Witness was in the rear of his res-
taurant cutting wood on the morning of January 1, 1887. He
was preparing to cook the supper for the Masonic Lodge enter-
tainment which was to be given on that night. While the wit-
ness was cutting his wood, the defendant, standing at a point
about sixty feet from witness, threw a beer bottle at witness.

The bottle passed the witness's head at very close quarters, and was shattered against a water closet beyond. Witness did not at that time know the defendant. Witness went up to defendant and said to him: "My God ! what did you mean by trying to kill me with that bottle." Defendant replied: "Maybe you don't like it !" Defendant then pulled out his knife. Witness seized a beer bottle, and defendant advanced upon him, whereupon witness went off and had defendant arrested. Defendant pleaded guilty to an assault and paid a fine. An hour or two later witness met defendant in McDavid's saloon. Defendant appeared to be "hot," and to want to get at witness. Witness said nothing more to him than that "a man who would try to murder a man was a murdering son of a b—h." Witness then left. He went back to the saloon between six and seven o'clock to get a drink. He found the defendant in the saloon, and, being afraid of the defendant, he walked to the stove instead of taking a drink. When the witness took his position by the stove, the defendant stepped up to him and said : "God d—n you, I am your friend, but you don't know it !" He then cut witness with his knife, while witness had both hands behind him, and was making no effort to strike him. Witness did not attempt to strike defendant until after he was cut. Defendant first cut the witness in the side, the knife penetrating the liver. He then stabbed witness in the left side of the stomach, making an opening five inches long, through which eleven feet of witness's bowels escaped. Witness was confined to his bed for five months, and had not yet recovered from the effects of the cut. McDavid's saloon was on the south side of the public square, and fronted north. The bar was on the east side of the saloon, and the stove stood in the floor west of the bar.

Cross examined, the witness said that he had taken two or three drinks, but was not drunk, when he was cut. McDavid's saloon joined witness's restaurant, and was visited by witness as often as he felt inclined to take a drink. Witness denied that in the saloon, and after defendant had paid his fine, he told defendant that he (witness) was not satisfied. He denied that he went into the barber shop and cursed the defendant. He denied that Bill McDavid ordered him to get out of the saloon and not raise a row. Witness did not see the knife in the hands of the defendant. Witness had both hands behind him, and made no effort to strike the defendant until after he was cut, when he knocked defendant down. He did not then jump on

defendant; nor did McDavid pull him off, telling him that he had already killed defendant. When witness passed the barber shop he saw the defendant, then in arrest and in the custody of C. C. Gragg. Defendant remarked: "There goes the damned Dutchman!" Witness replied: "I am not a Dutchman—I am an Irishman."

C. C. Gragg testified, for the State, that he knew both the defendant and William Wells. He saw defendant and Wells together about two years [hours?] before the fight. Witness arrested defendant on the complaint of Wells, and took him to the barber shop adjoining McDavid's saloon. At the barber shop, witness asked defendant what the matter was. He replied that nothing was the matter. Witness then told him that Wells accused him of trying to kill him with a bottle. Defendant replied that he did not try to kill or to hit Wells, but that he threw the bottle in fun. McDavid went to the mayor's office, pleaded guilty for defendant and paid his fine. While he had defendant in the barber shop, he called Wells in there and asked him about the charge against defendant, and Wells said that defendant tried to kill him with a bottle, throwing it at him behind his restaurant. The witness saw Wells after the fight. He was seriously cut. The cut in his stomach was about five inches long. Some of the entrails were protruding and had to be put back.

Cross examined, the witness said that when he called Wells into the barber shop, before the cutting, Wells called defendant a black hearted murderer. Defendant moved towards Wells, and Amos Powell interfered, pushed defendant against the wall, and defendant said that he wanted no trouble with Wells. Witness afterwards took defendant into McDavid's saloon, when Wells said something — witness did not remember what — to defendant. Witness and Wells were brothers-in-law. Both defendant and Wells appeared to be drinking some. Defendant was rather drunk, but appeared to know what he was doing.

S. L. Crowder testified, for the State, that he knew both defendant and Wells, and was in McDavid's saloon when the difficulty occurred. The fight occurred near the front of the saloon, and the witness was then near the back part of it. Wells came into the saloon and walked up to the bar, but turned from the bar and walked to the stove, near which defendant was standing. Defendant was the first person the witness heard

speak. He said: "I want it settled;" or perhaps: "We will settle it." Defendant at the same time pulled off his overcoat and threw it down. Witness, who was then about twenty feet distant, could distinguish nothing that was said by the parties, but saw the defendant motioning with his left hand, and then saw Wells strike defendant with a "——" [stick?] over the head or in the face. Wells then ran around the stove and knocked the defendant down with a chair, and somebody remarked that defendant was killed. The witness thereupon left. He afterwards saw Wells in his room. He was then cut in two places. His entrails were protruding from the cut on the left side. Witness had never before seen the knife exhibited in evidence, and could not say that it was the knife with which Wells was cut.

Cross examined, witness said that Wells entered the saloon at the front door. Witness did not hear all that was said at the stove. He was not undertaking to say what was actually first said or by whom. He was stating merely what he first heard. He did not know, nor was he undertaking to testify, as to who actually struck the first blow.

Mrs. B. A. Wells, wife of the prosecuting witness, testified for the State, that the defendant ate at the Wells restuarant before the trouble, but Wells was then in the kitchen and did not see him. Wells received three cuts in the difficulty, which confined him to his bed for three months.

Sheriff John H. Boyd testified that he arrested the defendant about an hour after the difficulty. Soon after the arrest Bill McDavid handed witness a pocket knife, the blades of which were about two and a half inches in length. That knife very much resembled the knife in evidence. Witness was not prepared to testify that the knife given him by McDavid was the knife of the defendant. On his cross examination the witness said that when he arrested the defendant the latter was in Head's saloon, and was about as drunk as he could be, short of a total collapse. He was badly beaten up, one eye being blacked, and his face above the eye being cut to the bone.

The State closed.

A. B. Edwards was the first witness for the defense. He testified that he and the defendant, who lived in the same neighborhood in Johnson county, went to Alvarado together on the morning of the day mentioned in the indictment. Defendant got to drinking and during the day he and witness went into the yard in the rear of McDavid's saloon, where they saw a man sawing wood.

Just as witness turned back into the saloon, defendant seized an empty bottle and threw it in the direction of the man. Witness did not see where the bottle struck. About the time the witness reached the back door, returning to the saloon, the man accosted the defendant and asked defendant what he meant by trying to murder him with the bottle? Defendant replied that he threw the bottle merely as a piece of fun, and had no intention to hit or to hurt him. The man then told defendant that a man who would try to kill another with a bottle in that manner was a "d—d black hearted murderer." Witness then appealed to defendant to go into the saloon, and he did so. The man, whom defendant afterwards ascertained was William Wells, then went to the mayor's office and had defendant arrested. When officer Gragg arrested defendant, he, defendant, asked some one of the crowd what he had better do about the matter. Somebody suggested that he would avoid annoyance by pleading guilty and paying a fine. Defendant thereupon handed McDavid fifteen dollars, and told him to go to the mayor's office, enter a plea of guilty for him and pay the fine. After the fine was paid Wells came into the saloon as often as three times, and said that he was not satisfied. At one of these times he cursed the defendant and denounced him as a "d—d black hearted murdering son a b—h." Defendant replied to Wells that he wanted no trouble with him. About fifteen minutes before the difficulty witness met defendant at the door of the saloon, when defendant gave witness fifty cents with which to get their horses from the livery stable. Just as witness got back to the saloon with the team he saw a number of men rushing out of the saloon, and heard somebody exclaim that defendant was killed. Witness took his team back to the stable, and next saw defendant at Head's saloon. He appeard to be unconscious, and was cut severely about the head. The bone over one of his eyes was broken in, and his face was covered with blood. When defendant came into the saloon just after throwing the bottle at Wells, he was laughing and explained to the crowd that he saw a man sawing wood, and that to frighten him, in fun, he threw the bottle past him and against a privy, and that it scared the man very much, causing him to run and jump a fence. On his cross examination the witness said that he had never, to his knowledge, seen the knife exhibited in evidence, and could not say that it was or was not owned by the defendant.

Amos Powell testified, for the defense, that he did not see the

difficulty, but before it occurred, he stepped into the barber shop and found defendant in the custody of officer Gragg. He asked defendant why he was in arrest. He replied that he did not know; that he had done nothing. About that time Wells stepped to the door and said that defendant tried to murder him with a bottle. Defendant denied such intent, and said that he threw the bottle in fun. Wells repeated his former statement and called defendant a d—d black hearted murdering son of a b—h. Defendant then made a movement towards Wells, but was pushed back by witness and Gragg, and Gragg and McDavid made Wells go back into the saloon. Witness then advised defendant to have no more trouble with Wells. He said, in reply, that he wanted no trouble. Witness then saw Wells and advised him to let defendant alone; that defendant would pay a fine for throwing the bottle, but would hurt him if bothered any more. Wells agreed to drop the matter. Defendant was then drunk and Wells was drinking. Defendant got mad in the barber shop, but made no effort to draw a knife.

William Bain testified, for the defense, that he was in the saloon engaged in a game of pool at the time of the difficulty. He observed the defendant in the saloon drinking throughout the evening, and saw Wells come in and drink several times. Witness's attention, at the time of the difficulty, was first attracted by McDavid, who walked to the stove near which defendant and Wells were standing, and remarked: "I will give each of you two dollars and a half, and treat you both, if you will stop this." Witness then heard Wells say: "I can stand what you say about me, but d—d if I can stand what you said about my wife." Defendant then put his hand to his coat pocket as if to draw something, when "Old Johnny," an Irishman, caught defendant's arm. Defendant jerked loose from Old Johnny, and Wells struck defendant in the face. Witness then saw the defendant make two motions with his left hand as if "striking both ways." The old Irishman then seized a poker and struck downward with it between the belligerents, and witness heard something strike the floor. Wells then ran around the stove, seized a heavy stool bottomed chair and struck defendant over the head, knocked him down, and jumped on him. Somebody exclaimed that defendant was killed, and witness fled out of the back door. Witness did not see a knife in defendant's hand, nor did he see anything in Wells's hand when he struck defendant in the face.

J. D. Bain testified substantially as did William Bain, but said positively that Wells struck defendant before defendant struck a blow. He saw no knife.

William McDavid, the proprietor of the saloon in which the difficulty occurred, testified, for the defense, that the defendant. came to town on the morning of the difficulty and got to drinking. He came into the saloon some time during the evening, from the back yard, and, laughing, said that he threw a bottle at a man whom he saw at a wood pile, and frightened him so that he ran like a buck; that the man then came up to him and accused him of trying to do murder; that he assured the man that he threw the bottle in fun, with no intent to injure him, but that the man had gone off to procure his arrest. He then asked witness what he should do about it. Witness replied that he was then too busy to attend to the matter. Within a few minutes Gragg came into the saloon and arrested defendant, and, with Powell, took him into the barber shop adjoining the saloon. Wells soon came in, took a drink, and went to the door between the saloon and the barber shop and called the defendant a "God d—d lying, black, murdering son of a bitch!" The witness then told Wells to leave the saloon, as he had to keep an orderly house, and wanted no row in it. Powell then spoke to Wells, and Wells agreed to, and did go, to his restaurant. Gragg and Powell then brought defendant into the saloon, and defendant then asked witness to go to the mayor's office and plead guilty for him, and pay his fine with fifteen dollars which he handed witness. Witness did as requested, and returned to his saloon. Soon afterwards Wells came into the saloon, and, addressing witness more directly than defendant, said that he was not satisfied; that a man who would try to murder a man with a bottle was a black hearted murderer. Witness then told Wells that the defendant wanted no trouble, and had paid a fine for what he had done, and advised Wells to go away. Wells went off, but soon returned, stepped to the bar where defendant was, and said to defendant: "I am not satisfied about this." Defendant replied: "Come to the stove and let's talk about this. I don't want a fuss; I meant no harm by what I did." Witness then went to them and told them that he would give each of them two dollars and a half and treat them if they would drop the matter. Wells replied that he could stand what defendant said about him, but not what defendant said about his wife, and struck defendant on or about the face with his fist. Defendant

then struck Wells twice ("cross licks"). Wells ran around the defendant and knocked him down with a chair and jumped on him, when witness interfered, pulling Wells off. Defendant got up and Wells knocked him down again, when witness again interfered, saying to Wells: "Don't you see you have killed him?" Wells replied: "Don't you see he has killed me?" and called witness's attention to his entrails protruding from a wound in his stomach. Witness then got help and took Wells to his room. When he returned to his saloon the defendant was gone. Witness saw nothing in Wells's hand when he struck the first blow, nor did he see anything in defendant's hand during the fight. Witness did not hear defendant say anything about Wells's wife. Defendant proposed to drop the difficulty, but Wells refused to do so. Defendant and Wells were both drunk.

Cross examined, the witness said that, at the time defendant was striking Wells, old Irish John seized an iron poker and struck downward with it between defendant and Wells, and witness heard something strike the floor. After the fight was over, witness picked up a black handled knife from the floor, which, after marking it, he gave to Sheriff Boyd. Witness did not know to whom that knife belonged. The knife in evidence resembled the knife he referred to.

The motion for new trial raised the questions discussed in the opinion.

*Poindexter & Padelford,* for appellant.

*W. L. Davidson,* Assistant Attorney General, and *O. T. Plummer,* county attorney of Johnson county, for the State.

HURT, JUDGE. This was a conviction for assault with intent to murder.

There is evidence that Wells, the injured party, struck appellant on the head or face first—that is, before appellant cut Wells. It also appears that defendant received a severe blow near the eye. This may have been inflicted by the blow given by Wells before defendant cut him, or by Wells after he was cut. Wells was physically able to knock defendant down with a chair.

No weapon was seen in the hands of either party. Whether the wound was inflicted near defendant's eye before or after the cut is important, as bearing upon manslaughter and self defense.

But the witnesses swear positively that Wells struck defendant before defendant did any act of violence, either consummated or threatened, and that the blow was upon the face, or head. Upon this state of case, the learned judge instructed the jury that "an assault and battery so slight as to show no intention to inflict pain or injury is not in law deemed an adequate cause."

How this law could be applicable to the above state of facts we can not understand; for, when viewed in the light of surrounding facts, there could be no doubt of the intention to injure. Let it be conceded that the wound near the eye was inflicted after the cut—still, the blow given the defendant by Wells, when viewed in connection with the attending facts, was evidently given with the intention to injure him. Of this there can not be a doubt. This being the case, the abstract law charged above had no application, and was calculated to induce the jury to believe that the learned judge believed that the battery was not so intended.

Again, suppose the blow produced the wound near the eye. If this was the fact, then it was not only adequate cause to produce the passion, but might have been complete justification. Was this phase of the case presented to the jury? It was not. Counsel for appellant, seeing the injurious effects of the charge of the court above cited, attempted to prevent it by requesting the law applicable to the very facts of the case. The court was requested to instruct the jury that an assault and battery by Wells, causing pain or bloodshed, would be adequate cause. This was refused and exceptions reserved.

There was error in charging the abstract law merely that an assault and battery so slight as to show no intention to inflict pain or injury was not adequate cause, because not applicable to the state of case presented by the evidence above given. There was error in refusing to give the instruction requested by counsel for defendant, because made imperative by the error in giving the charge above, and because demanded by the evidence in *the case.*

Upon the subject of mutual combat the learned judge instructed the jury as follows: "The law does not permit men to engage in mutual combat, and when two or more persons engage willingly in mutual combat, each is responsible for the consequences of his own act." As law to be applied to the case, or any phase of the case, the above proposition contains no light for the jury. Let us suppose that A and B willingly entered

into a combat, neither intending to kill the other, and A inflicts great injury upon B, and is killed by B. Now B would be responsible for the consequences of his own acts, it is true, but of what offense would B be guilty if he kills A under the passion produced by the great injury? The answer to this question would furnish practical information to the jury. Propositions of law may instruct the jury in some instances, but the above proposition, though correct, can not aid the jury in arriving at the offense committed by B.

If B is the aggressor, produces the difficulty—assaults A, but does not intend to kill, and A inflicts great injury upon B, and B, under the passion aroused by the injury, kills A, he would be guilty of manslaughter. (Art. 597, Penal Code.) Hence if B and A enter willingly into a combat, without intending to kill, and A inflicts great injury upon B, and B kills A in a passion caused by the injuries, B would be guilty of manslaughter, both being aggressors.

There was evidence showing a mutual combat; hence the charge of the court was not simply abstract error, the case demanding a proper charge upon the subject. Under the charge given, the jury may have believed that appellant should be held to the full measure of guilt in case he willingly entered into the combat; that the serious injury was eliminated from the case by the reason of the fact that the parties willingly entered into the combat.

We are not to be understood as intimating that, in the opinion of this court, appellant received his injuries before he cut Wells. It is not placed beyond reasonable doubt that he did receive them after he stabbed Wells. This being the case, a charge upon mutual combat was called for, especially so in view of the fact that the court submitted to the jury the above proposition, which could not possibly give the jury any practical information upon this subject, and was calculated to mislead the jury to the injury of appellant.

Other objections urged to the charge seem well taken, but are not of such a character as would require a reversal of the judgment.

The judgment is reversed, and the cause remanded for a new trial.

*Reversed and remanded.*